# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0365-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JASON MAYS,

     Defendant-Appellant.

_____

> Submitted May 11, 2021 – Decided May 28, 2021
>
> Before Judges Yannotti and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Indictment No. 17-01-0032.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).
>
> Michael J. Williams, Acting Hunterdon County Prosecutor, attorney for respondent (Jeffrey L. Weinstein, Acting Assistant Prosecutor/Special Deputy Attorney General, on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty on two counts of second-degree official misconduct, in violation of N.J.S.A. 2C:30-2(a), second-degree sexual assault, in violation of N.J.S.A. 2C:14-2(c)(2), and other offenses. The trial court sentenced defendant to an aggregate term of sixteen years in prison, with ten years of parole ineligibility. Defendant appeals from the amended judgment of conviction (JOC) dated September 17, 2018. We affirm defendant's conviction but remand for resentencing.

I.

In January 2017, a Hunterdon County grand jury returned an indictment charging defendant, a correctional officer at Edna Mahan Correctional Facility (EMCF) with: second-degree official misconduct by engaging in sexual conduct with A.F., N.J.S.A. 2C:30-2(a) (count one); third-degree criminal coercion of A.F., N.J.S.A. 2C:13-5(a)(4) (count two); fourth-degree criminal sexual contact with A.F. by touching her intimate body part for the purpose of sexual gratification, N.J.S.A. 2C:14-3(b) and N.J.S.A. 2C:14-2(c)(2) (count three); second-degree official misconduct, by engaging in sexual conduct with B.D., N.J.S.A. 2C:30-2(a) (count four); second-degree sexual assault, committing an act of sexual penetration with B.D. while she was detained in prison, N.J.S.A. 2C:14-2(c)(2) (count five); second-degree official misconduct by engaging in

A-0365-18

sexual conduct with M.D., N.J.S.A. 2C:30-2(a) (count six); third-degree criminal coercion of M.D., N.J.S.A. 2C:13-5(a)(4) (count seven); fourth-degree criminal sexual contact with M.D. by having her touch his intimate body part for the purpose of sexual gratification, N.J.S.A. 2C:14-3(b) and N.J.S.A. 2C:14-2(c)(2) (count eight); second-degree official misconduct by engaging in sexual conduct with C.L., N.J.S.A. 2C:30-2(a) (count nine); second-degree sexual assault upon C.L. while she was detained in prison, N.J.S.A. 2C:14-2(c)(2) (count ten); fourth-degree criminal sexual contact with C.L., N.J.S.A. 2C:14-3(b) and N.J.S.A. 2C:14-2(c)(2) (count eleven); fourth-degree criminal sexual contact with C.L., N.J.S.A. 2C:14-3(b) and N.J.S.A. 2C:14-2(c)(2) (count twelve); second-degree official misconduct by engaging in sexual conduct with J.O., N.J.S.A. 2C:30-2(a) (count thirteen); second-degree sexual assault upon J.O. while she was incarcerated, N.J.S.A. 2C:14-2(c)(2) (count fourteen); and second-degree pattern of official misconduct, N.J.S.A. 2C:30-7(a) (count fifteen).[1]

By order entered on March 27, 2018, the trial judge limited defendant's cross-examination of the alleged victims. The order stated that cross-

---

[1] We use initials to identify the alleged victims of the sexual offenses. See R. 1:38-3(c)(12).

examination was limited to the facts of the inmates' indictable convictions, the dates of the offenses, the degrees of the offenses, the names of the offenses, and the sentences imposed. Defendant was prohibited from cross-examining the inmate witnesses as to the underlying facts of the convictions, and the underlying reasons for any violation of probation.

We briefly summarize the evidence presented at trial. EMCF is the State's only all-female correctional facility. EMCF houses up to 600 inmates and employs about 340 corrections officers, eighty percent of whom are male. Defendant began working there in March 2005.

To qualify for this position, defendant was required to pass a civil service test, undergo a background check, and meet certain physical fitness requirements. Defendant met these requirements and participated in training at the Correctional Staff Training Academy (CSTA) in Sea Girt. CSTA provides training in various areas including firearms, physical fitness, the New Jersey criminal code, and ethics. Participants are instructed to avoid undue familiarity with inmates.

When defendant began his employment at EMCF, he was given an orientation list. Defendant acknowledged receipt of this list in writing. The list included the prohibition against undue familiarity with inmates and stated that

employees should not share personal information with inmates, or have any personal relationships with them, including sexual contact. Defendant also had training pursuant to the federal Prison Rape Elimination Act of 2003 (PREA), 34 U.S.C. §§ 30301-09, which also covered prohibitions on sexual conduct between inmates and corrections officers.

Lieutenant Hector Smith, the shift commander at EMCF, described the layout of the facility, which has several cottages, including Alpha and Bravo cottage ("A" and "B" cottage, respectively). Smith explained that there are no security cameras in "A" and "B" cottage, and there are no cameras in the inmates' cells. In "A" cottage, there is a beauty room and an ice room. Corrections officers are required to keep track of the number of inmates by regularly performing counts.

Smith also described the inmate disciplinary process. He said officers have the discretion to issue oral warnings or written charges to inmates for minor or "spot" infractions. More serious violations of the prison rules, including fighting and assaults, are written on a blue sheet. These violations may result in placement away from the general prison population.

Inmates are provided with the facility's code of conduct, which precludes, among other things, inmates from having personal relationships with corrections

A-0365-18

officers, including sexual contact. Inmates are required to report violations of this policy. If an inmate reports sexual contact by a corrections officer, the inmate is removed from her area and taken for a medical assessment. The inmate is placed in protective custody while the allegation is investigated. An inmate who falsely reports undue familiarity with an officer is subject to discipline.

A.F. testified that she had been incarcerated at EMCF on two occasions for drug offenses, shoplifting, and violations of the conditions of the intensive supervision program. She knew defendant as an officer while she was housed in "A" cottage. She said defendant began to tell her she was pretty, and then asked to see the intimate parts of her body during counts.

According to A.F., defendant's actions became physical when he caught her stealing food from the kitchen. He pointed to the "blue sheet" and asked what she was going to do for him. She was concerned a disciplinary violation would result in the loss of privileges and delay her release. Defendant told her to be undressed when he arrived for count. She complied. On another occasion, defendant arrived in her cell. She said he licked her neck and touched her breasts.

B.D. testified that in July 2016, she was an inmate at EMCF, where she was serving a sentence for burglary. She has prior convictions for fraud,

weapons, forgery, and possession of a controlled dangerous substance (CDS). She also has been sentenced to probation. B.D. said she was housed in "A" cottage at EMCF, and defendant was one of the corrections officers assigned to the cottage. She thought defendant was a "nice looking man" and "persistently" "came onto" him by flirting with him and trying to "look cute."

B.D. testified that around July 4, 2016, defendant showed her a condom and suggested that they go to the beauty room together during an inmate count. B.D. said she wanted to remain in her room, but defendant was afraid they would get caught and she agreed to go to the beauty room. Once there, they had sexual intercourse. According to B.D., defendant bent her over a chair and entered her from behind while she looked out the window to see if anyone was coming. They were interrupted when B.D. saw a Sergeant outside walking toward the front of the building. B.D. quickly pulled up her pants and ran to her room, and defendant returned to his office.

Approximately three months later, B.D. met with detectives from the prosecutor's office. She initially denied having sexual relations with defendant because she was frightened, and she did not want defendant or herself to get in trouble. Later that same day, B.D. revealed that she had sexual intercourse with

7

defendant once. She said she did not reveal more because she wanted to keep things "short" and did not want to get involved.

After she learned she would have to testify at trial in this case, B.D. told the prosecutors she also had performed oral sex on defendant in the officers' bathroom after he came in her room for count. B.D. said that she approached defendant when he came into her room for a count. He told her, "not here," and they went into the bathroom, where she performed oral sex on defendant.

Thereafter, defendant quickly left the bathroom. He handed B.D. some napkins and told her to make it look as if she was cleaning. She also told prosecutors that on another occasion in July 2016, she removed her clothes and sat naked on her bed, at defendant's request. B.D. described defendant's penis, indicating that it was lighter colored at the tip and darker toward his body. She was shown a photograph of the defendant's penis and testified that it looked like defendant's genitals.

C.L. testified that from March through August 2016, she was incarcerated at EMCF. She was serving a four-year sentence for attempting to obtain a CDS by fraud and possession of a CDS. She was housed in "A" cottage for a few months, and she saw defendant a couple of times per week during the morning or afternoon.

A-0365-18

She said she first became uncomfortable when defendant began making certain comments to her, such as "hey sexy." She stated that she did not report the comments because she did not want to get in trouble. She also believed her word would not be believed over the word of a corrections officer.

C.L. further testified that at times, while she was in her cell early in the morning during inmate count, defendant would touch her on her buttocks and vagina. She also complied with defendant's request that she touch his penis over his clothes. C.L. stated that she did so because she did not want defendant to become angry, and she was coming up for parole in August 2016.

C.L. stated that eventually, defendant told her he wanted to meet her in the beauty room during inmate counts when no one else was around. She testified that defendant was adamant about being in the beauty room because that room had a window which faces toward the main entrance of the building and he could see if anyone was coming.

C.L. testified that at some point, she went with defendant to the beauty room. Defendant had a condom. She pulled down her pants and underwear and they had sexual intercourse. They stopped because someone was approaching the outside entrance. C.L. ran back to her cell. She told three of her close friends, inmates J.D., A.F., and C.G., about the incident.

A-0365-18

Later, C.L. was released to a halfway house. Law enforcement officers visited her there and questioned her about defendant. She testified that initially, she did not mention having sexual intercourse with defendant because she was afraid she would be sent back to prison. However, the investigators returned approximately one week later, and she told them she had not been completely truthful. She said that she and defendant had sexual intercourse.

M.D. testified that she was incarcerated at EMCF for two years because of her conviction for theft and possession of a CDS. She had been sentenced to probation, but she violated probation and was sentenced to a term of incarceration, which she served at EMCF. M.D. acknowledged that she had prior convictions for possession of a CDS, criminal trespass, shoplifting, and theft.

M.D. testified that in 2016, she had been housed in "A" cottage, where defendant worked on Sundays and Mondays. She explained that in July or August 2016, defendant became flirtatious and expressed an interest in having sex with her. She said defendant would ask to see her naked when she got out of the shower, and he would pull her covers off when she was sleeping.

M.D. further testified that on one occasion, defendant came to her cell and had her stroke his penis. At another time, defendant asked her to remove her

A-0365-18

panties. She complied because she felt she did not have any choice in the matter. She said the tip of defendant's penis was lightly colored and the bottom part was darker in color. She was shown the photographs of defendant's penis. She said the penis shown in the photos was consistent with her recollection.

M.D. also stated that about one week later, defendant called her into his office and said he was not going to do her any special favors such as smuggling in items from outside the prison or overlooking disciplinary infractions. She asked defendant why he would risk ruining his career by engaging in sexual activity with inmates when he could have sex outside the prison.

According to M.D., defendant acknowledged that risk and indicated he could go to jail or face a lawsuit. M.D. said defendant continued to tell her that he wanted to see her vagina and ask her to "go on all fours." She testified that she did not initially report these incidents because she was afraid it would delay her release date.

J.O. testified that she had been an inmate at EMCF since July 2009. She had been convicted of aggravated manslaughter, possession of a weapon for an unlawful purpose, and other offenses. She had been sentenced to twenty-five years of incarceration and required to serve eighty-five percent of her sentence

11

A-0365-18

before becoming eligible for parole. She also had a prior conviction for possession of a CDS.

J.O. stated that defendant began to flirt with her by making comments about her body. She said she welcomed his attention. She testified that in April 2016, she and defendant went to the ice room at "A" cottage, while another inmate acted as a lookout. J.O. said she performed oral sex upon defendant. She described his penis as large and circumcised. She stated that defendant's penis was hooked-shaped, like a banana.

J.O. stated that during this incident, defendant began to curse at her for her choice of a lookout. According to defendant, that inmate had a reputation for being a "snitch." J.O. stated that after she finished performing oral sex upon defendant, she and defendant left the room separately. She returned to her cell. The inmate who had acted as the lookout also testified and corroborated parts of J.O.'s testimony.

Defendant testified on his own behalf. He denied having any sexual contact with the five inmates who testified against him. He said they had all fabricated the allegations as retaliation because he had disciplined them. He stated that he caught M.D. with food she was not allowed to have, and she was angry because he made her discard it. Defendant admitted he never "wrote up"

12

the accusers, but insisted they were out to get him. He claimed he heard them say they were going to "get" him.

Defendant's girlfriend testified for the defense. She was asked to describe defendant's penis. She said it was not shaped like a banana and did not have a hook-like shape. She acknowledged that the tip was lighter in color than the bottom part. She was shown photographs and said they accurately depicted defendant's penis and its overall coloration.

Defendant also presented testimony from an inmate, who said she saw several inmates, including A.F. and M.D., crushing and snorting pills at EMCF. The inmate also testified that she heard A.F. tell M.D. she was going to "set" defendant "up" because he caught her several times with food that she had stolen.

Another inmate testified that there were no disciplinary problems at "A" cottage until B.D., M.D., and C.L. arrived there and began crushing and snorting pills. The inmate said she heard B.D., M.D., and C.L. angrily state they were going to "get" defendant. She told defendant what she heard and warned him to be careful.

The jury found defendant guilty on counts four (official misconduct by engaging in sexual conduct with B.D.); five (sexual assault upon B.D.); nine

13

(official misconduct by engaging in sexual conduct with C.L.); twelve (sexual contact with C.L.); and fifteen (engaging in a pattern of official misconduct). The jury found defendant not guilty of the other charges. Thereafter, the judge denied defendant's motion for a directed verdict or, in the alternative, a new trial.

At sentencing, the judge merged count five with count four, and count twelve with count nine. On counts four and nine, the judge sentenced defendant to eight-year terms of incarceration, each with a five-year period of parole ineligibility. The judge required defendant to serve the sentences consecutively.

The judge also sentenced defendant to a concurrent eight-year term of incarceration on count fifteen. The judge entered the JOC dated August 6, 2018, and an amended JOC dated September 17, 2018. This appeal followed.

On appeal, defendant raises the following arguments:

> POINT I
> DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO PREJUDICIAL JOINDER; THE TRIAL COURT SHOULD HAVE SUA SPONTE ORDERED A SEVERANCE OF THE COUNTS ALLEGED AS TO THE SEPARATE VICTIMS. (Not Raised Below).
>
> > (a) Prong 1 – The evidence was not relevant to a material issue.
> >
> > (b) Prong 4 – The State would have failed to establish that the probative value of the evidence is not outweighed by its apparent prejudice.

POINT II

THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE COURT'S DENIAL OF DEFENDANT'S RIGHT TO PRESENT RELEVANT EVIDENCE DESIGNED TO ATTACK THE CREDIBILITY OF THE WITNESSES.

POINT III

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS FOR JUDGMENTS OF ACQUITTAL [NOTWITHSTANDING THE VERDICT] OR NEW TRIAL.

POINT IV

THE SENTENCE OF EIGHT YEARS IN PRISON, [WITH] FIVE YEARS [OF] PAROLE INELIGIBILITY ON COUNTS 4 AND 9, RESULTING IN SIXTEEN YEARS IN PRISON WITH TEN YEARS OF PAROLE INELIGIBLITY WAS EXCESSIVE BECAUSE THE COURT ERRED IN APPLYING AGGRAVATING SENTENCING FACTORS ONE AND TWO.

## II.

As noted, defendant argues that the trial court erred by failing to sever sua sponte the counts pertaining to the different alleged victims. He contends he was denied a fair trial by the joinder of the counts for trial.

A. Invited Error.

We note initially the State contends that defendant's failure to seek severance of the counts involving the five separate alleged victims was apparently part of the defense strategy. The State notes that, at trial, defendant

claimed that the alleged victims had conspired against him in retaliation for his disciplinary actions. According to the State, the joint trial of the charges involving the five alleged victims furthered the defense strategy of showing that they engaged in a conspiracy to frame him. The State therefore argues that defendant's argument regarding severance should be barred under the invited error doctrine.

"Under that settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. . . .'" State v. Bailey, 231 N.J. 474, 490 (2018) (alteration in original) (quoting State v. A.R., 213 N.J. 542, 561 (2013)). "In other words, if a party has 'invited' the error, he [or she] is barred from raising an objection for the first time on appeal." A.R., 213 N.J. at 561 (citing N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342 (2010)). "The doctrine prevents litigants from 'playing fast and loose' with, or otherwise manipulating, the judicial process." Bailey, 231 N.J. at 490 (quoting State v. Jenkins, 178 N.J. 347, 359 (2004)).

Here, defense counsel did not file a motion for severance of the counts involving the separate alleged victims and did not object to the joinder of the charges. However, defense counsel did not expressly seek a joint trial on all

charges in the indictment. Furthermore, there is nothing in the record indicating that defense counsel wanted joinder of the charges as a matter of strategy.

The record shows that defense counsel did, in fact, claim that the alleged victims conspired to frame defendant. Counsel may have pursued that defense because the charges were joined in the indictment and he believed a severance motion would not be successful. This is not the sort of "gamesmanship-driven scenario to which the invited error doctrine is traditionally applied." Ibid.

Therefore, we will address defendant's argument that the trial court should have, on its own motion, severed the counts involving the five alleged victims.

B. Joinder of the Charges for Trial.

Rule 3:7-6 permits the State to charge multiple offenses in the same indictment in a separate count for each offense. Under the rule, joinder is permissible if the offenses "are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan." Ibid.

Rule 3:7-6 further provides that "[r]elief from prejudicial joinder shall be afforded as provided by [Rule] 3:15-2." Rule 3:15-2(b) states that if "it appears that a defendant . . . is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation the court may order an

election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief."

Joinder of offenses is favored but interests in economy and efficiency do not override a defendant's right to a fair trial. State v. Sterling, 215 N.J. 65, 72-73 (2013). The test for determining prejudice is "whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges." Id. at 73 (alteration in original) (quoting State v. Chenique-Puey, 145 N.J. 334, 341 (1996)).

Evidence of other crimes, wrongs, or acts "may be admitted . . . as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b)(2). Such evidence is admissible if it is relevant to prove a fact genuinely in dispute "and the evidence is necessary as proof of the disputed issue." State v. Darby, 174 N.J. 509, 518 (2002) (quoting State v. Hernandez, 170 N.J. 106, 118-19 (2001)).

Furthermore, "[i]f the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" Chenique-

Puey, 145 N.J. at 341 (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).  N.J.R.E. 404(b)(1) provides, however, that "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition."

In State v. Cofield, the Court adopted a four-part test to determine the admissibility of other-crimes evidence:

> 1. [t]he evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. [it] must be similar in kind and reasonably close in time to the offense charged;
>
> 3. [t]he evidence of the other crime must be clear and convincing; and
>
> 4. [t]he probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [127 N.J. 328, 338 (1992).]

"Trial courts must apply that test on a case-by-case basis 'in order to avoid the over-use of extrinsic evidence of other crimes or wrongs.'"  State v. Green, 236 N.J. 71, 82 (2018) (quoting Cofield, 127 N.J. at 338).

On appeal, defendant argues that the evidence of the offenses sought to be severed did not meet the first prong of the Cofield test.  He asserts the evidence

was not material to any issue in dispute because he had denied committing any of the alleged sexual offenses. Defendant also argues that the evidence was not necessary to show he had a motive to engage in the alleged sexual conduct. He contends that motive would have been established by proof he committed the alleged conduct.

Here, the other crimes evidence was relevant to prove that defendant had engaged in similar acts with each of the alleged victims under similar circumstances. The evidence also was relevant to show that defendant had the opportunity to engage in sexual activity in the inmates' cells or other rooms where he would not be seen. Thus, the evidence satisfied the first prong under Cofield.

Defendant further argues that the other crimes evidence did not satisfy the fourth Cofield factor. He asserts that any probative value the evidence might have had was substantially outweighed by its undue prejudice. He contends the State offered the evidence solely to show that he had a propensity to commit sexual offenses. He asserts the evidence distracted the jurors and led them to forego an independent analysis of the evidence as it pertained to the charges against each individual victim. We disagree.

Admission of evidence of other crimes or wrongs "requires an inquiry distinct from the familiar balancing required under N.J.R.E. 403: the trial court must determine only whether the probative value of such evidence is outweighed by its potential for undue prejudice, not whether it is substantially outweighed by that potential as in the application of Rule 403." Id. at 83 (internal citations omitted) (citing State v. Barden, 195 N.J. 375, 389 (2008)). "[I]f other less prejudicial evidence may be presented to establish the same issue, the balance in the weighing process will tip in favor of exclusion." Id. at 84 (alteration in original) (quoting State v. Rose, 206 N.J. 141, 161 (2011)).

Here, the balance weighed in favor of admission of the evidence of the other alleged crimes. As noted, the evidence was relevant to show that defendant had the opportunity to engage in such activity with inmates and it was feasible for him to do so while he was working. The evidence was prejudicial to the defense, but not unduly so, and there was no less prejudicial evidence to establish these facts.

Moreover, the judge instructed the jury that defendant had been charged with various offenses involving five separate victims. The judge told the jury it must consider the allegations regarding these victims separately. The judge stated:

You should not consider any of the proofs that were presented during this trial to prove defendant guilty of the counts against one of the victims as proof against the other victim as they must be considered separately.

You may not conclude that just because you find defendant committed the offenses against one of the victims that he must be guilty of committing the offenses against the other victim. The State must separately prove beyond a reasonable doubt the offenses alleged against each independent victim. And therefore you must consider the offense against each victim separately and independently.

We must assume the jury followed the judge's instruction. State v. Burns, 192 N.J. 312, 335 (2007). As noted previously, the jury found defendant guilty only on the counts involving two of the alleged victims and found defendant not guilty on ten counts involving the other three inmates. The jury's verdict indicates that the jury followed the court's instructions and considered the charges as to each alleged victim separately.

III.

Defendant next argues he was denied the right to a fair trial because the trial judge precluded him from presenting relevant evidence challenging the credibility of the five alleged victims who testified against him. He argues that the judge should have permitted him to introduce evidence that these witnesses had violated prison rules by using and distributing drugs, which he claims was

22

relevant to show that the victims fabricated the allegations to avoid disciplinary actions. Defendant further argues that the judge erred by precluding him from challenging the credibility of the alleged victims by questioning them about their criminal records.

A trial court's evidentiary ruling is reviewed under an abuse of discretion standard. State v. Prall, 231 N.J. 567, 580 (2018) (citing Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). An appellate court will not set aside an evidentiary ruling unless it appears that the trial court made a "clear error of judgment." Ibid. (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)).

At the time of the trial of this case, N.J.R.E. 608 precluded the use of specific instances of conduct to challenge the credibility of a witness. State v. Scott, 229 N.J. 469, 481 (2017). The rule "bar[red] not only the use of extrinsic evidence but also cross-examination into specific instances of misconduct." Id. at 488 (Rabner, C.J., concurring).[2]

---

[2]  N.J.R.E. 608 was amended effective July 2020 in response to the Court's decision in Scott. See Biunno, Weissbard, & Zegas, Current N.J. Rules of Evidence, cmt. on N.J.R.E. 608 (2021). We apply the version of the rule in effect when the case was tried.

The rule "permit[ted] evidence in the form of opinion, reputation, or a prior criminal conviction to attack a witness's credibility by establishing the witness's character for untruthfulness." State v. Guenther, 181 N.J. 129, 140 (2004). However, "in limited circumstances and under very strict controls a defendant has the right to show that a victim-witness has made a prior false criminal accusation for the purpose of challenging that witness's credibility." Id. at 154.

In this case, the judge granted the State's motion to limit cross-examination of the victim-witnesses. The judge noted that the State was not seeking to prevent admission of the alleged victims' prior convictions, but rather, to limit the defenses from questioning these witnesses on the conduct that resulted in their convictions.

The judge stated that N.J.R.E. 609 only permits evidence of prior indictable offenses that are the subject of valid convictions, but not juvenile or disorderly persons matters. The judge also stated that while a violation of probation cannot be used to impeach a witness, the sentence imposed may be used to impeach the witness pursuant to State v. Jenkins, 299 N.J. Super. 61, 75 (App. Div. 1997).

24

The judge then conducted a N.J.R.E. 403 analysis and found that, as so limited, the alleged victims' prior convictions were relevant, probative, and not unduly prejudicial to the State. The judge noted that evidence the alleged victims were incarcerated at EMCF or another correctional facility due to a criminal conviction would necessarily be brought out at trial.

The judge also noted that Guenther applied in limited circumstances where the witness made a prior false accusation similar in nature to the crime with which defendant had been charged. The judge stated that except for that limited exception, the evidence rules did not permit the admission of specific instances of prior bad conduct for the purpose of challenging the credibility of a witness.

The judge therefore found the evidence rules only permit proof of the convictions themselves, not the specific underlying acts that resulted in the convictions, to be admitted for the purpose of challenging the credibility of the witnesses. The judge found that to delve into those details would be unduly prejudicial to the State, confuse the jury, and effectively create minitrials.

We are convinced the judge's decision was consistent with the evidence rules in effect at the time this matter was tried. The judge correctly found that a witness's prior convictions could be used to challenge the credibility of the

witness, but the defense could not inquire into the facts underlying those convictions.

We note that the judge allowed defense counsel to claim the alleged victims had conspired against him in retaliation for taking disciplinary actions against them. The judge also permitted defendant to assert that the alleged victims' claims were an attempt to preempt the imposition of disciplinary sanctions. In addition, the judge instructed the jury that:

> [C.L.] smoked cigarettes and met with [J.D.] in her room in violation of [EMCF] rules. The defense also introduced evidence that [A.F.], [B.D.] and [M.D.] smoked cigarettes, used drugs and traded pills in violation of [EMCF] rules. The evidence has been offered to show bias by these witnesses against the defendant. You should consider this evidence along with all the other evidence in the case in determining whether or not the state has proven beyond a reasonable doubt that defendant is the person who committed the crimes alleged in the indictment.

Thus, the record does not support defendant's contention that the trial judge denied him of his right to a fair trial by limiting him from presenting evidence regarding the alleged victims' other crimes and bad acts. The record shows the judge considered the evidence, excluded cumulative or inadmissible evidence, and allowed the defense to present relevant evidence pertaining to the defense's claim that the witnesses had conspired and fabricated the claims

26

against defendant. The judge's decision to limit cross-examination of the inmate witnesses was not a mistaken exercise of discretion.

IV.

Defendant also argues that the trial judge erred in denying his motion for a judgment of acquittal, or in the alternative, for a new trial. He argues that the State's evidence was insufficient to support the jury's verdict.

Defendant asserts that the State relied almost entirely upon the testimony and credibility of the alleged victims. He contends there was no corroborating evidence to support their claims, and there was no physical evidence to support the allegations. He argues that the convictions represent a miscarriage of justice.

Rule 3:20-1 provides that the trial court may grant a motion for a new trial "in the interest of justice. . . . unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." The decision is committed to the sound discretion of the trial judge, and an appellate court "should interfere with the exercise of that discretion only when 'a clear abuse has been shown.'" State v. Van Ness, 450 N.J. Super. 470, 495-96 (App. Div. 2017) (quoting State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004)).

A-0365-18

On appeal, our review "is limited to a determination of whether the trial court could reasonably have reached the findings it made based on 'sufficient credible evidence . . . in the record.'" Id. at 496 (alteration in original) (quoting Brooks, 366 N.J. Super. at 454). We must defer to the trial judge's "feel for the case" because the judge "had the opportunity to 'observe and hear the witnesses as they testified.'" Ibid. (quoting Brooks, 366 N.J. Super. at 454).

We reject defendant's argument that the judge erred by denying his motion for a judgment of acquittal or a new trial. We affirm the denial of defendant's motion substantially for the reasons stated by the trial judge in her written opinion addressing that motion.

In the opinion, the judge carefully reviewed the evidence pertaining to counts four, five, nine, twelve, and fifteen, and noted the elements of each offense. The judge applied the correct standard for ruling on a motion under Rule 3:20-1 for judgment notwithstanding the verdict or for a new trial.

The judge found that the State had presented sufficient evidence to support the jury's finding that defendant committed the offenses beyond a reasonable doubt. The record supports the judge's analysis and conclusion. Defendant's contention that the State presented insufficient evidence to support the jury's verdict lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

## V.

Defendant also argues that his sentence is excessive. He contends the judge erred in her findings on the aggravating and mitigating factors. He also contends the judge improperly imposed the same sentences for the offenses involving B.D. and C.L.

Here, the judge found the following aggravating factors applied to counts four, five, nine, and twelve: three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). In addition, the judge found that the following additional aggravating factors applied to counts nine and twelve, which involved defendant's sexual activity with C.L.: one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense); and two, N.J.S.A. 2C:44-1(a)(2) (gravity and seriousness of the harm to the victim).

The judge noted that, based on her testimony at trial, C.L. was particularly vulnerable and incapable of exercising normal mental or physical resistance. She had been approaching her release date and feared her release would be delayed if she did not yield to defendant's sexual advances. The judge also noted that C.L. was young, had an extensive history of drug abuse, and was new to the prison system, which defendant was probably aware of.

29

The judge explained that while aggravating factors one and two applied to C.L., they did not apply to B.D. The judge noted that defendant also had preyed upon B.D.'s vulnerabilities. However, B.D. had more experience in the prison system than C.L, and she did not have the same problems as C.L.

The judge further found mitigating factor seven applied. N.J.S.A. 2C:44-1(b)(7) (defendant has no history of criminal delinquency or activity). The judge found that no other mitigating factors applied. The judge concluded that the aggravating factors substantially outweighed the mitigating factors and that a substantial period of incarceration was necessary.

The judge also reviewed the factors for consecutive and concurrent sentences pursuant to State v. Yarbough, 100 N.J. 627 (1985), and determined that consecutive sentences should be imposed as to defendant's official misconduct because there were separate victims of these offenses, and the crimes occurred at separate times.

On appeal, defendant argues that the judge erred by imposing the same sentences on counts four and nine, even though the judge found aggravating factors one and two applied to C.L., but not B.D. He contends the judge failed to differentiate between B.D. and C.L., the facts underlying the offenses, or how the aggravating factors applied to one offense and not the other.

Defendant further argues that the offenses were not committed in a particularly heinous, cruel, or depraved manner. He asserts there was nothing about the nature of the offenses that would warrant imposition of a sentence above the statutory minimum of five years for a second-degree offense. N.J.S.A. 2C:44-1(a)(1).

These contentions have no support in the record. As noted above, the judge thoroughly explained why aggravating factors one and two applied to the offenses involving C.L. and why these aggravating factors did not apply to the offenses involving B.D. Moreover, the judge fully explained why she was imposing the same sentence on counts four and nine.

We reject defendant's contention that the judge abused her discretion by imposing an eight-year term of incarceration, each with five years of parole ineligibility, on counts four and nine. We also reject defendant's contention that the judge erred by treating elements of the offenses as aggravating factors for sentencing.

Defendant asserts that aggravating factors one and two are subsumed within his conviction for official misconduct as to C.L. The judge properly considered both the nature and circumstances of the offense, and the gravity and seriousness of the harm to the victim in determining the sentence that should be

31

imposed on count nine.  This was not impermissible double-counting of the elements of the offense, as defendant claims.

We are constrained, however, to remand for resentencing.  While this appeal was pending, our Supreme Court issued its opinion in State v. Torres, N.J. ___, ___ (2021), and addressed the standards for imposing consecutive sentences.  The Court stated that Yarbough requires the trial court to place on the record a statement of reasons for imposing consecutive sentences, which should address the overall fairness of the sentence.  Id. at ___ (slip op. at 26) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

The Court held that "[a]n explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings, is essential to a proper Yarbough sentencing assessment."  Id. at ___ (slip op. at 27) (citing Miller, 108 N.J. at 122).  As noted, in this case, the trial court imposed consecutive sentences.  We therefore remand for resentencing in light of Torres.

Affirmed in part, reversed in part, and remanded for resentencing in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION